Good afternoon, and the first one is Matheis v. CSL Plasma, numbers 18-3415 and 3501, with Mr. Nahas, is that right? Nahas. Nahas, and Mr. Douglas and Mr. Delacorte. Good afternoon, Your Honors. I'd like to reserve five minutes for rebuttal. Sure. Mr. Douglas. As the Court is aware, this case involves an ADA accommodations issue. The plaintiff in this case, Mr. Mathias, is a disabled... That's how you pronounce it, you pronounce it Mathias? Yes. Okay. That's how he pronounces it. That's what we're going with. Disabled retired police officer and veteran with PTSD. He had, in order to earn a little bit of additional income, then donating plasma at the site of the defendant, CSL Plasma, for a period of about 10 months, having gone through a lengthy medical history to begin with. During that time, he acquired a service dog to assist... We got the facts. Okay. Well... Let me start towards the end. So he was deferred, that's the right term, right? Right. Because of ODIN. Yes. And he was told he needed a note from a doctor, right? To try to undo the deferral. He never produced it, correct? Correct. He was told that he needed a note from a doctor to say that he was safe and fit to donate without ODIN. Right. And that's how he had been donating for many, many times until he showed up with ODIN that first day. Correct. But he never produced that note. As far as... There's nothing on the record to suggest he even tried to get the note, right? No dispute. He did not produce the note. Our position is the policy that CSL has in place that says we defer you if you have an anxiety disorder and you use a service animal is discriminatory without an actual legitimate basis. And that violates the ADA. So... If he were to give him the evidence that would be needed that suggests the accommodation is necessary, but he didn't do that. Well, I think it would be slightly different if they asked him to get a note that said, despite his use of a dog, he is safe to donate with it. Because, of course, the defendant and the appellee's position on this is our policy is in place because if you use a service animal associated with an anxiety disorder, that means your disorder is so severe that you pose a risk to yourself or others in our facility. And our position is there's no evidence in the record, even the expert declaration that was submitted to support sovereign judgment, to support that. And the ADA requires that if you're going to have discriminatory policies, which you're allowed to do for health and safety, they have to be based on actual risks, not mere speculation, stereotype, or generalization. And there was no evidence on what I would submit is the affirmative defense of the defendant that their policy is based on any actual risk. In fact, I would submit that the evidence that does exist in the record suggests that just the opposite. In Mr. Mathias' case, his condition was alleviated by the presence of a service animal. But that would be true if he went into a panic attack, the dog, as I understand, would have to apply pressure therapy, correct? Or lean on him or vice versa, and he would be on an elevated table at the time, and I'm assuming the dog would be on some sort of tether. How would that work? Well, the fact is that there's nothing to suggest that he was any more likely at the time that he came in with Odin to have a panic attack than he had been since the beginning when they deemed him eligible. And that was the letter that he was requested to provide? No, he was asked to say he can donate without the dog. If the court stated it a little bit different, stated just the opposite.  Let's suppose that CSL had a policy that anyone with a service animal for psychiatric support had to have a letter from their doctor saying they could safely donate with their service animal. Let's suppose that was their policy. That's a different policy, and I haven't analyzed that. But it's a policy. It's a policy, but it doesn't discriminate against people who use service animals, which their current policy does. It says, okay, maybe we need a little bit extra information, and then we'll allow you to donate. But don't they take the position as, look, we've taken a look at the question of the use of service animals, and we've looked at why people use service animals, and anxiety is one of the reasons why a person would use service animals. And accordingly, we've adopted this position that if someone is taking two medications or is using a service animal, that means that they have anxiety and that we're not going to allow them to donate. What's wrong with that? Because it runs directly contrary to the ADA, which says you have to provide reasonable accommodations for people with disabilities. And their policy is not to exclude people if they have anxiety, because if you have an anxiety disorder, he disclosed his anxiety disorder at the very beginning. He disclosed the medications he was taking for it. And so they don't have a policy that says... He did, and was on medication for it. And he went 10 months donating regularly without incident. Nothing changed with his condition except perhaps that it got better when he got his dog. He came in with his dog, and they say because you have a dog and an anxiety disorder, you're not allowed to donate. All right, let me ask you a question on how we evaluate this discrimination claim. You talked about CSL's position being an affirmative defense. It looks like the district court of sorts used the McDonnell-Douglas burden-shifting test. Yes. Do you think that test is applicable here? I do. You do? Yes. Why? Well, because I thought... Not in your brief. You never said that in your brief. Well, I think we have the McDonnell-Douglas test and the regs that say you can have a discriminatory policy if it's based on actual risks. Right. Which, I argue, requires the defendant who has the discriminatory policy to demonstrate that that policy is based on actual risk. And I think that is very much in line with the McDonnell-Douglas burden-shifting test. Yeah, but that's not a pretext. You're not showing pretext by that. No, because they haven't established... The pretext part is the third element, right? Right. So they haven't established the second element, that they have a legitimate reason. Their legitimate reason is, if you're using McDonnell-Douglas, their legitimate reason is, look, we think anybody that uses a service animal has a level of anxiety that we don't want to have to put up with in our center. Right. That's what they say. Right. But there's nothing in that that says that's an actual risk. So if you're using McDonnell-Douglas, then that throws you to the third test, the third step as to why that's a pretext. Well, I think there's a burden of proof, Matt. You have to provide evidence as the defendant on your affirmative defense that would allow that conclusion by the jury. See, I think you're combining two tests here. I might be. I wasn't trying to trick you by that question. I was trying to ascertain, since you hadn't responded to it, whether or not you thought it was applicable. I think a combination is appropriate. I think the reg speaks directly to it. It says you have to demonstrate an actual risk if you have a discriminatory policy. And there's been no demonstration of an actual risk here. That's a little bit different than McDonnell-Douglas. I mean, usually McDonnell-Douglas is, hey, somebody got rid of me for discrimination purposes. And then you go to the employer and the employer says, no, here's the reason we got rid of him or her. And then you go back and say, wait a minute, no, that was just that was a rationale, a pretext for what they just said. And the real reason is X and not Y, as they said. Here it's a little different. They have a policy. It's not a policy that starts off and says we want to discriminate against your client. It's that we have a reason for believing that a service dog absent hearing or sight impairment is a problem. And you're saying, no, wait a minute, it's not a problem. You need to take this, I would have thought, on a case-by-case basis. And now you're saying, no, it's McDonnell-Douglas. I'm a little lost in terms of understanding with Judge Fischer how McDonnell-Douglas will be the best analytical framework for analyzing this case. Well, I think you have the race and the test might be slightly different. But my understanding of McDonnell-Douglas is it can't just be that you have a policy. If the policy is discriminatory on its face, there has to be a legitimate, nondiscriminatory reason for it. And here with the combination of the Reddit that says actual risk, the defendant would have to demonstrate some level of actual risk associated with their policy before the burden shifts back or to establish their affirmative defense. So what do you make of their expert's affidavit? I think their expert's affidavit, the opinion in there is that the one opinion that I can find, having read it many, many times, is that people with severe anxiety may pose a risk in their facility. I don't find anything in his affidavit that suggests that the use of a service animal denotes severe anxiety. I want to make sure I understand what you're asking for here and why you're asking for it. You're saying that the district court was incorrect in granting summary judgment. Correct. Okay. What is the genuine issue of material fact that exists here that made that summary judgment grant incorrect? The genuine issue of material fact is whether there's a correlation between the use of a service animal for anxiety disorder and the severity of the anxiety. And whether their policy is based on an actual risk or generalization stereotypes and speculation. Okay. Thank you. We'll get you back in rebuttal. Thank you. Mr. Douglas. Good afternoon, your honors. May it please the court, counsel. Appearing for CSL plasma, Bruce J. Douglas, along with Rachel C. Stone. I have two points I'd like to address with the court. First, and I would like to come back to Judge Restrepo's question about the doctor's note. And to Judge Fisher's point about what is the genuine issue of material fact. But then we have the cross appeal, which is whether or not the plasma collection center is a place of public accommodation. Well, let's start with that. The title three talks about, among other things, a service establishment. And why isn't this a service establishment? Very well, your honor. The we have two different court of appeals, courts of appeals decisions on this. No, we understand. And we have leverage. The same fact, you know, same facts, et cetera. Right. And they go very different ways. The 10th Circuit. So but why? When I look at these words, I mean, there's a lot of things that are covered. You know, everything from a laundromat to a hospital. And then it says or other service establishment. No longer does it say or other similar service establishment. And so why isn't a plasma center a service establishment? There are several reasons, your honor. The first and foremost is that it provides no service to the public, provides no service whatsoever to the donor. Well, what happens is he comes in and he gives plasma, which he's done like 90 times, and he gets paid. That's so he the service, in effect, he gets is he gets money. He gets money. But that's incidental to the service that he's providing. You see, it's all plasma. The center exists for one purpose only, and that is to collect human source plasma. But he can't just come in and say, here's my plasma. No, he cannot. He's got to come in and say, here's my blood. And will you extract the plasma from my blood? No, he can't do that either. The no one can do that. The blood banks wouldn't accept blood that they don't extract either. Your honor. The point is that the center exists for the purpose of collecting raw material for manufacturing. It's the first step in the manufacturing process. Isn't that a service? No, the service. There is no service rendered. What is it if it isn't a service? It is the collection of a raw material in the same way that any manufacturing facility collects raw materials, whether it's coal, timber, you know, oil, petroleum, whatever. And to accept the argument that has been made by the plaintiff in that CSL. Is it open to the public? It's open to the public, right? It is. The front door, of course, is open to the public. And that is of necessity, your honor, because we're collecting the plasma out of living beings. So they have to come to the center. This is not something that one can do in a blood mobile. It's not something people can do in their home. It has to be done under these conditions. So they do come to the front door, but they do not automatically get to go to any other portion of the building, namely the donation floor. And that is highly restricted. And that's really the key element of the difference between a commercial facility, which we acknowledge CSL Plasma Center is, and a place of public accommodation. If you follow the thinking through, then the ADA should not have applied to Casey Martin, who was a participant in a engulf. Well, I may respectfully disagree on that point, your honor, for this reason. And it goes back to two different concepts. And I think that sometimes it's overlooked, and certainly the plaintiff, Mr. Mathias' counsel, overlooks it. We're dealing with two different categories of establishments under ADA Title III. We're dealing with commercial establishments, which are defined in the statute. And then we're dealing with places of public accommodation. Every establishment, every commercial establishment, many places are commercial establishments. Let me put it this way. One court did. Every place of public accommodation is a commercial establishment. Every commercial establishment is not a place of public accommodation. The difference is that only places of public accommodation are covered by section, by 42 U.S.C. section 12182A, which is the anti-discrimination provisions of Title III. Commercial establishments are covered by the barrier elimination provisions, and that type of thing. Now, as to your honor's point about Casey, Casey's an interesting case. But the fact of the matter is, what was alleged of the claim there, the golf course, of course, is listed as one of the places of public accommodation in the statute. The issue that the court considered, and Justice Scalia called it a benevolent decision, perhaps not a really rational one, was whether or not— It was 7-2, so seven people thought they were being rational. I understand that. But the issue was the tournament, was whether or not the competition part of being on the golf course. It wasn't the issue of whether or not you could be on a golf course, because a golf course is expressly listed among the places of public accommodation in the statute. Let's assume we affirm on the other ground. Can we get to this issue? Because you won the district court. As we affirm, can we even get to this issue? Well, we did raise it on a cross-appeal. I know you raised it, but can we properly get there if we affirm on the other ground? Yes, Your Honor. They're two separate—well, I see the point that you're making. The analytical tension there is that the court said we were a place of public accommodation and then went on to hold that we had a legitimate non-discriminatory reason, or that we had a legitimate concern about the safety and the ability of Mr. Mathias to donate safely without posing a direct threat to others. That's more or less the basis. I think that the proper decision should have been, if the court had followed—and this court, of course, can affirm on any ground. Right, but if we affirm on the first, so to speak, can we get— I suppose the court doesn't need to get to that issue. We would like the court to reverse on that issue, because if the district court had held that we were not a place of public accommodation, it would not have been necessary to get to the discrimination issue, because the commercial establishment isn't covered by that section of the statute. Now, if we get to the merits here, the CSL is requiring Mathias to get a note saying that he can safely donate without poking the dog. Is that correct? That is correct. And that was misstated by— I think the court— Got it backwards. Well, I think the court was—actually, the court was quoting—it's on page 30 of the district court opinion. She's quoting, I believe, paragraph 71 in the Statement of Material Facts. But our Statement of Material Facts was actually quoting something that Mr. Mathias said. But in fact, this clinic said you can get a note that says you can donate safely without the dog. The reason for that is—and let me explain. Certainly, Mr. Mathias was a valued individual, a valued donor. He donated some 70 to 90 times without incident. That's true. But every single time that a donor comes into the center to donate, they go through a screening process. Part of the screening process is a very quick health test to make sure that they are healthy. And another part of the screening process is each time—and today it's done electronically in a kiosk— you fill out what is known as the Uniform Donor History Questionnaire. The DHQ is a document that is prepared by the industry in conjunction with CBER, which is an agency of the Food and Drug Administration. You fill that out. And the purpose of that is your condition from week to week, month to month, can be different. The dog was a red flag as to the possibility that his condition, which was known as PTSD, might be more serious. And that is why he was flagged and stopped and asked to get a note. So I hope that that part is clear. So the reg, which is Section 36301B, requires that any safety rule— and this is obviously what I presume here we have— must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities. Based on the fact that—what evidence is there in the record that people with service dogs who, in effect, calm them down, or are there to calm them down, present the same profile as an anxiety patient who's taking various medications? The evidence of that is found in Dr. Nelson's affidavit. And I'd like to mention that, first of all, there is no other evidence in the record. There's no contrary evidence. The plaintiff did not engage an expert. The plaintiff didn't put in his own evidence, which, if he wanted to, he could. So both by the fact that he never did bring in the note, to Justice Restrepo's point, and the fact he didn't put any evidence on his own, to Justice Fischer's point, where is the genuine dispute as to a material fact? We say there is none. As to this, one must understand that this was a professional medical opinion by a licensed physician. The medical directors who work for CSL are not simply folks off the street, like you might find in some insurance company that gives you these great opinions in ERISA cases. These are people who are trained and experienced in transfusion medicine. That's their specialty, because that is the area. Let's look at what Nelson declared. He said CSL's general policy is to defer a donor who requires more than two medications. That's not until the medications or service animal need decreases. Next, the policy is not directed to the use of a service dog, as it allows service dogs for vision and hearing impaired. It is my professional medical opinion that donors with severe anxiety present serious health and safety risks. That's very conclusory. What corroborates what he just said? There is another portion of his declaration, which I can't pinpoint at the moment, but the presence of the dog was viewed as a proxy for a further serious deterioration of his condition, such that he could have an episode in the chair. And to Judge Restrepo's point, what would the dog do? He could, yes. But I think the point being, let's look at this on a case-by-case basis. Certainly. He's done 90 times. He now comes in with a service dog that otherwise is allowed for those with hearing and sight impairment. Yes. And they're saying, nope, can't have it because we think that you will be so anxious, it's a safety risk. And he, you know, obviously the first thing is, well, yeah, but given 90 times, there's not been a problem. Why the problem now when I bring in something that makes him even calmer than those other 90 times? So I'm trying to get past the generalizations of Dr. Nelson. What corroborates what Nelson's saying as a conclusion? It is his experience working for some 25 years in the Veterans Administration, dealing with patients with PTSD. That sounds like me telling my colleagues, I spent 19 years doing, you know, this job. I know what I'm doing. Well, they can look at me and go, right, get out of here. The point is, the dog is, simply put, the dog is an additional element of risk in the center at that point because what the dog would have, unlike seeing the dog for the blind person or the person who needs help ambulating, what the dog would do, to Justice Restrepo's point, is he would apply pressure. The only way he can apply pressure is by jumping up on the bed or the table to do that. This man is connected to a machine that is sucking out his blood, separating it, and putting it back in his body. And, by the way, and I know this isn't really in the record, but a donation floor may have 50 or 60 other donors at the same time sitting side by side, maybe a few feet apart on what looks kind of like a lazy boy chair, having their blood removed and put back into their body. Having an animal on the loose that the handler cannot control, and it is his responsibility under the DOJ regulations to maintain control of the animal at all times, puts the staff at risk, it puts others at risk. That's different than simply Mr. McLeod is going to have to do. You know what, it could, but in this person's case where he has this very good track record of giving plasma in the past, why does this general rule automatically apply to him? The rule is applied because the medical staff determined, in their view, that the presence of a dog because of the donor's need for, because of anxiety, posed an undue risk to the staff and to other donors on the floor, and that is the reason. Now, couldn't they have gotten to that point? I think what you're jumping, what you're saying is we have a policy on service animals. If they had just asked a few more questions and established on the record that the reason that the plaintiff now has this service animal is a heightened anxiety, could they not have then eliminated the question of whether or not it was an actual risk? But it seems like here what happened was there was this consultation. Somebody came back and said we have a policy service animal. Do not pass by. No donation. To answer your question, Your Honor, that was one of the reasons for asking him to get a note. Had he brought the note back, that process probably would have continued. It's not exactly the same as the interactive process that is required under Title I of the ADA, but that was part of the process. He did not complete the process. He never came back. He never brought a note. Let's take this hypothetical. Suppose he brought back a note that some doctor said, yeah, he's still safe to donate. His condition isn't materially worse than before. The question then would be does he really need the dog? After all, this dog wasn't prescribed for him by anybody. It was a gift from his daughter, and he trained it himself. So who knows what would have happened had he brought the note back and had further discussions occurred. I'd leave the Court with one other point, and that is under the DOJ regulations, if I may just direct the Court's attention to Section 28 CFR, Section 36.302C, the DOJ regulations do not require that service animals be allowed in any place in a public accommodation where the public is not generally allowed. So even if this were to be a public place of public accommodation, the regulations don't actually require service animals to be allowed on the donor floor anyway. Judge Fischer asked your colleague about the McDonnell-Douglas test. What's your view on the McDonnell-Douglas test in this scenario? A number of different courts have considered this. I think there's some uncertainty out there with respect to Title III cases, what the model of proof should be. I think perhaps, and I hate to say this because we did prevail on this issue given the analysis by the District Court, this may or may not really be a McDonnell-Douglas case. After all, a McDonnell-Douglas case goes to cases involving indirect evidence of discrimination, and here we set exactly the reason for deferring the gentleman having to do with his anxiety, i.e. his disability. But I also suggest two things. Number one, the plaintiff, Mr. Mathias, seems to think the McDonnell-Douglas test applies, and if that is the case, then he also must accept the first requirement of McDonnell-Douglas, which is that his client be qualified to donate. And if his client isn't qualified to donate in the first place, then he would fail the McDonnell-Douglas test on that score. But he was qualified to donate 90 times in the past. And that's true, Your Honor, but if I may just respond to that and explain one thing. People come in all the time. By federal regulations, they're only allowed to donate twice in a seven-day period. That's the maximum by FDA regulations. Not everybody donates for a long period of time. Not everybody donates every week. It's hit and miss. The point is, each time they come in, they are evaluated again on two scores. They are evaluated to make sure that they are healthy enough on that day to donate. And Mr. Mathias was deferred a couple of times. He recognizes that can happen. That's in the record. They're also screened by the Uniform Donor History Questionnaire to determine that they are free of any diseases or other conditions that would impair the safety and integrity of the plasma. So, for example, there are lots of things, lots of reasons, hundreds of them, actually, why people are deferred temporarily until their condition passes. For example, pregnant women are not allowed to donate blood or plasma for a period of months after the pregnancy. People who have had surgery recently are not allowed to donate plasma. People who have traveled to certain parts of the world maybe temporarily are not allowed to donate plasma. So the point is, once medical condition changes over a period of time, and the mere fact that he donated successfully 70 or 90 times in the past isn't any evidence, really, that he would be qualified or eligible to donate in the future, his condition could have changed. And that's precisely what the presence of the animal signaled to the staff. You now need a dog in order to donate safely. Did they say to him, if you go and get a doctor's note, that you can safely donate with or without a dog? Without. Without. Without. But what if the doctor says he can safely donate with a dog? CSL probably would not accept that because that opinion, that would be coming from a non-expert in the field. In the same way that a surgeon would not accept the opinion of a general practitioner who says, my patient is fine for surgery today. The surgeon would make his own decision on that. CSL would make its own decision. I think what would have happened, given the fact that Mr. Mathias had donated so many times that he hadn't walked into the center for the first time that day, I suspect what would have happened is that the discussion would have continued, and assuming he brought the note back that said, yeah, he's safe to donate with or without the dog. I mean, who knows? The doctor might have said, he doesn't need the dog. I didn't tell him he needed the dog. The doctor might say, no, he cannot donate without the dog. So what happens if a sight-impaired individual comes in with a service dog? They don't really explore, do they, whether this person has any anxiety in addition to the sight impairment. Is that correct? No, that same person fills out the Uniform Donor History Questionnaire each time he comes in as well and he has to report medical conditions. So if it's just a question of the person is sightless and he has a trained seeing eye dog, I guess we used to call them that, that's fine. Because there's no reason to believe that person will not be able to maintain control of the animal throughout the process. So if, for example, I once worked with somebody who trained service dogs, and she would take that service, the various dogs she had with her everywhere, and if she showed up to give plasma with her service dog, and she's also in the process of training it, they just automatically wouldn't let her give plasma. For she doesn't need the dog for anything, she's just training the dog? Correct. Well, you know, I think that there's a part of the regulation that talks about having the dog with you for purposes of training, but this is not, this isn't, you know, that's not the purpose of the center to have people come there to train their animals. You know, if she doesn't really need the dog for any purpose, why would she need to bring it into the donor floor? Well, because she's training it wherever she goes. I mean, they really have to be, as I understood it at the time, that dog had to be with her nearly all of the day. Well, if she needed the dog all the time. No, she's training the dog. She's training the dog, okay. Well, the point is, she doesn't really need the dog for any particular medical purpose, she's just, she's training the dog. And so the question that I would pose is, why would we put 50 or 60 other people plus the staff at risk so somebody can bring their dog into a plasma collection center? Well, what's the risk? I mean, she might lose control of the dog, might get loose. It's not the center's responsibility to police the dog. What I'm really hearing you say, we have this general policy, and except for people with sight or hearing impairments, we're not going to budge. I would say this, Your Honor. It's not simply a matter of having the policy. The policy is based on the medical staff's determination that the presence of a dog, because the donor has such a severe case of anxiety. But I just gave you an example of somebody who's training a dog who doesn't have anxiety. I'm sorry? I just gave you an example of a person who's training a service dog, wants to get plasma, has done it in the past, does not have anxiety, and you're saying in that situation the person would be turned away. I don't know that we've ever had that situation, but that situation perhaps she would be able to have the dog present because she doesn't have any condition and she's not at risk of losing control of the animal. I guess what makes this case all the harder is this wasn't his first time. We talked about that. He had been in there 90 times before. He had no problem. He had no anxiety 90 times before. The mere fact he showed up as a service animal, he ends up under your policy, which never applied before, but under your policy to be eliminated from donation. These policies, Your Honor, are not... That's why I wonder whether or not that isn't a material fact that Mr. Nahas is saying should have been submitted to the jury. Well, if that's a material fact, then I suppose they could have argued that material fact and created a material fact in the record. They certainly did not. But the point is these policies are not invented for the purpose of discriminating against people in an unlawful way or being mean to people. Plasma, there's a worldwide shortage and need for plasma that's extremely great. CSL Plasma would like to collect all the plasma it possibly can from people who are healthy enough to donate and give a safe product. There's no intention here to discriminate against Mr. Mathias. The concern here, and this is where the district court grounded her opinion, the concern here is the safety issue. Safety of the staff, safety of the other donors. The medical staff determined that if you have two or more medications, that's a big risk. If you have the service dog, that isn't it. It's a proxy. It's an indicator that your condition has deteriorated or your condition is such that there's such a risk that it puts the rest of the folks on the donor floor at risk. Again, that could be the case. You could be right in some cases. But not all cases. And when you have a track record of somebody having come in previously for 90 times and without being turned away for being overly anxious and now comes in with something that's even more calming than those previous 90 times, nonetheless you're going to apply this general policy that in some cases is a safety risk, therefore we're going to presume that this is a safety risk. And it just is counterintuitive. Let me give you another example that's even more counterintuitive, and I'll respond directly to your point. First of all, there's really no evidence in the record other than Mr. Mathias' own testimony that the dog has a calming effect on him. What we're talking about here now is the difference between screening and the individual assessment of the health of the donor. There are two things at play. The individual health assessment is required by federal regulations to make sure the donor is healthy enough to donate. Screening is required by the FDA to make sure that the product received is safe enough. Here's probably perhaps a very counterintuitive thing. Anyone who has lived in Great Britain for more than six months during the last 35 years cannot donate blood or plasma in the United States because of the possibility that they've been exposed to Creutzfeldt-Jakob disease, otherwise known as mad cow disease. It makes no difference whatsoever whether or not they in fact have disease. That's the difference between screening. There are layers of safety imposed by the FDA, and the industry gets together and does this in conjunction with the FDA's agency called CBER, the Center for Biologics. That's the difference between what goes on under Title I, for example, in the employment context where we have to have this individual assessment and interaction with the employee, and here we're dealing with an industry that's highly regulated and must screen out. So what you're saying, if you take it to the nth degree, is that it makes no difference if this person who previously gave plasma 90 times is even less anxious with his service dog there for the 91st time. I don't think it makes no difference, and I don't mean to be harsh about it, Your Honor. CSL wanted this gentleman to continue to donate. That's the business it's in. Had Mr. Mathias brought in some type of medical documentation from his physician saying something like, the dog is helpful, the dog keeps him calm, he should be able, in my opinion, he should be able to maintain control of the dog at all times, we might be dealing with a different case. We're not dealing with that case today simply because Mr. Mathias abandoned the process and did not follow through. All right, let's hear from Mr. Delacroix. Thank you, Your Honors. Thank you. May it please the Court, I'm John Delacroix. I'm representing the Plasma Protein Therapeutics Association, the Industry Trade Association. And if I may, I'd like to start off right where the last kind of discussion ended with the fact that Mr. Mathias had donated 90 times. That's a critical fact here. And what I think it goes to is the incentives of a plasma collection center. Just take your voice up just a tad. Yes, absolutely. I think it goes to the incentives of the plasma collection centers. If the concern here is that by holding that a plasma collection center is not a place of public accommodation, that they'll be incentivized to discriminate frivolously against those who are disabled, I think that's not a real concern if you look closely at the incentives. And in order to understand those incentives, you need to understand something a little bit about how plasma collection centers work. The first thing is that in order to collect plasma for manufacturing, you need a lot of donations. And so to take, for example, a single hemophilia patient would require 1,200 individual donations to treat that one patient for one year. As a result, you need a large number of donors and you need repeat donors. You need donors who come in more than once. As Mr. Douglas mentioned, the limit is twice per week or 104 times per year. You can see that Mr. Mathias was right at the top of that, that he had donated 90 times in a 10-month period. So he was very valuable to CSL plasma. So your theme is really relating to whether CSL is subject to the ADA itself, correct? That's the question you're trying to respond to? Right. And the reason you think it is not subject to the ADA is what? Well, because it's part of the manufacturing process. But what I was going to was that the incentive of the plasma collection center is to not turn donors away. I get it. And so, you know, that invites the question, okay, you really want the plasma, but you've got some strong policies here and those policies don't provide for exceptions except in the case of those who are hearing or sight impaired. But I think your point is more basic. I assume you're saying this is not a service establishment. I am saying this is not a service establishment. And the reason that you want to follow the Fifth Circuit approach as opposed to the Tenth Circuit approach is what? Well, the reason is that it's a manufacturing facility and that first and foremost a plasma collection center doesn't fit within the statutory definition. If you look at the statutory definition of a service establishment, you have to include the elective examples. You have to include the you have to apply the scanners of statutory construction. And when you do that, you say, well, I mean, lots of businesses today provide offer services to the public in exchange for something other than money. And so. He comes in. He's not giving his money to them. They're giving money to him for having donated plasma. Why is that? Or is that a crucial difference? The way the money flows? Absolutely. That's a critical difference. If one looks at the other illustrative examples of a service establishment, you see things like a grocery store, a gas station, a pharmacy and all of these. What about a bank? Well, a bank. You you. Well, I guess the difference with the bank would be that you provide your your assets. And and then the bank has the has the use of that. I go in and I set up an account with you. I put some money in. And when I come in thereafter, you get you can give me. Some of my money back with interest. That's right. That's it. That's a that's the money is flowing from the bank to the customer. That's right. The but the customer is receiving the benefit. They've got a number of different benefits from having their, you know, Mr. Mathias is getting a benefit. He's getting 200 to 300 dollars for contributing his plasma for a great good, which is to get plasma out there, which is sorely needed. Well, I would say he's not getting a benefit in that. There's no no one receives a benefit by having their plasma extracted for them. There's no health reason or other reason why an individual is getting money. Well, that's right. But I think if you go to that definition, which the district court did, I think the problem with that definition is that it's overly broad and then it begins to. Well, isn't the Martin case and a host of other cases say that the ADA is to be interpreted broadly? Well, it certainly should be interpreted broadly, but it should not be interpreted without limits. And certainly should be construed in accordance with the statute. I mean, I think the problem with adopting this definition where you just look and say service establishment, it's an establishment that provides a service to anyone in the universe rather than looking to see if the benefit of that service is being enjoyed by a member of the public, specifically the customer, is that you begin to encompass entities that are clearly everyone would agree are not places of public accommodation. What if we view the donors as employees or contractors? Well, certainly, if you took that perspective, then that would be covered by a different title. I don't want to be covered by title one. That's absolutely right. So that's so again, what's happening here is they're being paid for their being paid. We could see a relationship where they come, they give their plasma and they're being paid. Well, they're being paid for their inconvenience, right? They're being paid for their time and inconvenience. It's the plasma donation. Come on. But realistically, they're not being paid to sit in the chair. They're being paid because they're donating plasma. Well, with respect, I would say they're being paid for their time and inconvenience. I mean, there there's a whole ethical debate about whether you can be paid for a human tissue. And that's that's raging not only here, but overseas. And so it's an important distinction to note that you're not being paid for. The donor is not being paid for the plasma itself. Don't give the plasma. They're not getting paid. What's that? They don't give up the plasma. They're not getting paid. Right. That's right. Yes. Why is it a punch or is a pawn shop a service establishment? Why is it is a pawn shop a service establishment? Well, I would argue that a pawn shop is is is a service establishment. I guess members of the of the public are welcome to a pawn shop. But I think that what that really question gets to is what are we talking about here? Are we talking about the openness of the facility? In which case, then you get into the distinction between the lobby area. You're saying a pawn shop is a service establishment because. A pawn shop is a service establishment. The pawn shop is I would distinguish a pawn shop in that. No, but let's just say that is you say a pawn shop is a service establishment. I'm asking you because just finish the sentence. A pawn shop is a service establishment because I guess it's open to the public. I'm not sure the consumers come in and they sell goods for money. Right. Isn't that what happens here? No. Well, first of all, again, I would go to the characterization. That's important. Ethical distinction that you're not. The individuals are not selling their plasma. They're being paid for their time and inconvenience. Further note that this question, if you just go sit in the chair, they're going to give you 200 to $300. And they don't take any of your blood and extract the plasma. No, that's probably not unlikely. So then I don't see why this is any different than a pawn shop. Well, I would say it was different. First of all, one major difference is a pawn shop is not pervasively regulated by the Food and Drug Administration and international regulators and a whole set of industry standards. That doesn't help you. Well, how does that work? I think that would that would help me in distinguishing that. The reason that pervasive regulation is present is because it's a manufacturing site and not a public establishment. Yeah. All right. Thank you very much. We'll get back on. Thank you, your honors. On that last point, hospitals, doctor's offices, many other public accommodations are highly regulated areas. So that issue does not bear on whether the plasma donation facility is or is not a place of public accommodation. I'd like to address a couple of points that were made to presentations. The suggestion that if a if the if when Mr. Mathias was told, come back with a note from your doctor to say that you're safe to donate without the dog. If that had led him to bring back a note from the doctor to say the dog is helpful. And that may have changed the C.S.L.'s analysis. That's just beside the point here. The fact is their policy says no service dogs for anxiety disorders. And there was not an individual assessment of him when he came in with the dog. In fact, his testimony was one of the medical staff when someone who had seen him 70 or 90 times or a good portion of those, when they saw him with the dog, they said, you can't have that in here. And then eventually he was led back. There was some conversation. They found out the reason that she said that apparently is because there's a policy. You can't have a service dog for anxiety in the facility. There was no individual assessment here on the public accommodation issue on the on the service establishment issue. The service, I argue, that is being provided is the extraction of the plasma. To say that this is akin to other manufacturing facilities where source provider comes in and sells the source material to the manufacturer in exchange for money is is not the same. In those cases, if it's a oil company, they have the specialized equipment to take the oil out of the ground and sell it to the refinery. If it's a timber company, they have the employees and the personnel and the equipment to log the forest and sell those to a paper mill here. Mr. Mathias, as I forget who actually pointed this out, does not have the ability to extract his own plasma and then exchange that for compensation. The service that's being provided to him is the specialized equipment and personnel, the facility and the compliance with with regulations, presumably that allows him to go there and have his plasma safely extracted for which he can then obtain compensation. This this case to to distinguish the plasma facility from all of the enumerated examples takes, I would suggest, some mental gymnastics. This is not far from a professional office, a medical office, a pawn shop, as your honor suggested, a recycling facility, which the district court cited where you bring your recycling to a to someone. They either pay you for it or take your trash. That's a service that's being provided. The consumer is not paying anything for that service. And yet the recycling facility is a place of public accommodation. Some other examples that cross my mind are a facility that does clinical testing. They put out an ad for people to participate in a sleep study in exchange for payment to suggest I don't have a case to cite on that. But I would suggest it would be impossible to allow that facility to discriminate on the basis of disability under the auspices that it's not a place of public accommodation or a service establishment. They think further. Just one moment here on our indulgence. I appreciate it. The one final point that I would make is that if if Congress had intended that a service establishment be only a facility where the public exchanges payments for a service, that would be in the law. It's not in the law. I think this is a public, a place of public accommodation. Thank you. Thank you very much. Thank you to all council for being with us today. Take the matter under advisement.